IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2024 Session

## STATE OF TENNESSEE v. SEDRICK DARNELL CUMMINGS

**Appeal from the Circuit Court for Coffee County**
**No. 2023-CR-48688          William A. Lockhart, Judge**

_____

### No. M2023-01345-CCA-R3-CD

_____

The Defendant, Sedrick Darnell Cummings, appeals as of right from his misdemeanor domestic assault conviction, for which he received a sentence of eleven months and twenty-nine days probation after service of ten days in jail. The Defendant contends that the evidence was insufficient to support his conviction and that the trial court erred in admitting alleged prior bad acts. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JILL BARTEE AYERS and MATTHEW J. WILSON, JJ., joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Sedrick Darnell Cummings.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry (appellate brief) and Ronald L. Coleman (oral argument), Senior Assistant Attorneys General; Craig Northcott, District Attorney General; and Marcus D. Simmons, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On August 21, 2022, Danielle Lewis, the victim, called the Coffee County Sheriff's Department to obtain a police escort to return to her home following a domestic dispute with the Defendant, her boyfriend and the father of her two children, during which the Defendant told her to leave. The dispute was triggered when the Defendant found paperwork in the victim's car seeking to obtain child support from him. The Defendant became angry with the victim and yelled, "[Y]ou're lucky I'm not blowing your f****** brains out. How could you do this to me?" He grabbed the victim's neck, dragged her

from the bathroom, slammed her head on the kitchen counter, and pushed the victim, twice. The victim wanted the escort to avoid "being hit . . . threatened or anything" when she returned to retrieve her belongings. The Defendant was subsequently arrested at his home. Based on this conduct, on May 15, 2023, a Coffee County grand jury indicted the Defendant with alternative counts of assault by causing another to reasonably fear imminent bodily injury (count one), and assault by extremely offensive physical contact (count two).

**Motion in Limine.** Prior to trial, the State filed a motion in limine pursuant to Rule 404(b) "to admit evidence of prior bad acts and hostile relationship between the Defendant and the alleged victim." The State asserted, "In the years leading up to the charged offenses in this case, Defendant began a pattern of persistent emotional abuse and physical violence towards [the victim]." The State attached a photograph of the victim to the motion, which appears to show the victim with a bruised and swollen jaw. The photograph was taken on a cell phone and was dated August 1, 2020.

Before the trial, a hearing was conducted on the State's motion in limine. At the beginning of the hearing, the trial court referenced the photograph attached to the motion and asked the State if that was the only incident the State was seeking to admit because their motion "seem[ed] kind of broad . . . [and the court had] to find by clear and convincing evidence that each alleged incident happened." Because there was no timeframe alleged in the motion, the trial court specifically asked the State for the dates and the times of the alleged incidents they sought to admit. In response, the State advised the court that the victim was prepared to testify regarding "all of these prior incidents[.]" The trial court repeated its prior concern, and the State responded, "If I am limited to that 2020 [incident related to photograph] . . . that's what I will restrain my questions to[.]"

The State later explained that it would limit its question to the victim to "[H]ad [the Defendant] ever previously hurt you, can you identify the photographs." Defense counsel then interjected that the purported Rule 404(b) information from two years before the instant offense "has nothing to do with whether a reasonable person would be placed in imminent fear." Defense counsel ultimately argued that the victim's statement that the Defendant said, "[Y]ou're lucky I don't shoot you or you're lucky I don't blow your brains out" was not an assault regardless of whether the victim was in fear because fear cannot be imminent from that statement. He argued further that the 404(b) information served no other purpose than to inflame the jury.

The victim testified that she had been in a relationship with the Defendant for six years prior to the offense and that they shared two young children. The first time the Defendant became physical with her was at the hospital following the birth of their second child when the Defendant shoved her. The Defendant's behavior became "progressively"

- 2 -

worse and developed into a "pattern" of violence. The victim said the Defendant would always yell at her to leave the home, and when she began to leave, he would "get physical" because he did not want her to leave. She agreed the Defendant would "[t]hreaten to kick [her] out, not let [her] leave . . . . and then strike [her][.]" She said the Defendant "just wanted to be able to threaten [her] with that." The physical violence escalated each time she attempted to leave and included "jerk[ing] [her] by the hair of [her] head and pull[ing] [her] in the house[,]" "punch[ing] [her] in the mouth[,]" "holding a baseball bat up against [her] throat[,]" and "hit[ting] [her] with a box fan."

The victim identified the photographs attached to the motion. She explained that they were photographs she had taken of herself in August 2020 after the Defendant had punched her in the mouth. The photographs depicted bruising and swelling of her mouth and jaw area. As a result of the incident, the victim's tooth was chipped and became infected, and the Defendant paid for her to get treatment. Asked if she took any other photographs of the injuries the Defendant inflicted upon her, the victim said she did not because she did not think to take any at the time. Asked if there were any other incidents that occurred leading up to the August 2022 incident, the victim said, "[t]here was always screaming, fighting, threats." Each time the victim attempted to leave, the Defendant would physically assault her and verbally threaten her by saying, "You know, I can have stuff done to you. You know, no one will know. They'll just think you wrecked if I have someone run you off the road. . . . No one will even know anything happened to you."

On the morning of August 21, the day of the instant offense, the Defendant found child support papers in the victim's car and became upset. The Defendant approached the victim in the home where she was sitting with her children and said, "[Y]ou know, you're lucky I'm not blowing your f****** brains out. How could you do this to me? Why is this -- you know, why would you write this about me?" The victim said the Defendant was screaming and started throwing things. She thought "it was going to be really bad" and told the Defendant that her father was coming as a ruse to calm the Defendant down.

As the victim tried to move away from the Defendant, the Defendant came behind her and "jerked [her] by [her] neck from the bathroom[.]" She said her four-year-old son fell in the bathtub when the Defendant did so. The victim said the Defendant continued to yell at her about the child support papers, took her back in the kitchen, and "slammed" her head on the kitchen counter. The victim said, "I knew at some point he was either going to kill me or hurt me bad enough to where I would be permanently damaged[,] or my kids were going to get hurt." She said this incident followed the "same pattern" as the August 2020 incident.

- 3 -

On cross-examination, the victim agreed that she did not call the police or lodge a complaint against the Defendant during the six years of their relationship. She said it was her "stupidity" for believing he would not hit her again.

In granting the State's motion, the trial court stated:

So we've had the hearing. Only testimony heard from one witness. It was corroborated with pictures that a domestic assault occurred. So I think that that meets the standard of clear and convincing evidence that the assault occurred. It was completely unrebutted and there's photographic evidence that we've admitted into evidence showing that. So now I've got to move to what the purpose is other than the act conforming with that conduct. I agree with the State. There's a long line of cases, including another case that wasn't referenced, State v. Mitchell from 2006, and I find that the -- this incident goes to show the relationship between the parties, the intent, a settled purpose to harm the victim. I do think, also, that looking at the instruction, - that it is not a totally, completely objective standard of reasonableness, that you've got to look somewhat as to the mind of the victim and whether they would be reasonable under all the facts and circumstances, so I think that it is relevant for that purpose as well. So I'm going to allow the -- and I do not think that it is more prejudicial than probative. Also I find that it is – they're not super old allegations. It's within two years of the prior incident. So I'm going to allow that in. I'm not going to allow the photographs themselves to be entered because I think they -- that crosses the line of too prejudicial, but the incident itself, the description of the injuries I'm going to allow in. So –

The State asked the court whether its ruling was limited to the August 2020 incident or whether they were permitted to ask the victim generally about prior incidents of violence and whether these incidents established a pattern of abuse. In response, the court clarified that there was not enough specificity as to the other incidents and limited the State to the August 2020 incident. However, the court also noted that "a reference that this was not the only time it happened or something similar" was permissible.

**Trial.** The victim testified consistently with her testimony from the motion in limine hearing. Since the birth of her son, she had become afraid of the Defendant, and their relationship had deteriorated. She attempted to leave him multiple times, and as part of her preparation to leave, she had obtained child support papers the summer before the instant offense. Ultimately, she did not file the child support papers and returned to live with the Defendant. The child support paperwork remained in the victim's backpack until the Defendant discovered it in the victim's car on the day of the instant offense. The victim was inside the home watching television with her children when the Defendant came

- 4 -

inside, waving the papers in the air and screaming, "[H]ow could you do this to me?  What the f**k is this?"

The victim said that she stood up but did not get close to the Defendant because she was afraid of getting hit or grabbed.  The Defendant then started to throw cleaning bottles at her.  She demonstrated for the jury how the Defendant grabbed the back of her neck and pulled her from the bathroom to the kitchen.  She said he slammed her head on the kitchen counter where the child support papers were.  The Defendant was screaming so close to the victim's face that she said she could feel his spit on her.  The victim said the entire argument with the Defendant lasted for twenty minutes, and she was afraid of him the entire time.  The victim was aware that the Defendant possessed firearms and had seen him "pull guns on people, his own son, his oldest son[.]"  She observed firearms in the home in plain view in a partially open drawer on the morning of the offense.  Asked if "[w]hen [the Defendant] told [her] [he] should blow [her] brains out, [was she] afraid that he would do it," the victim replied, "Yes.  He's --  I did not --  I mean, I know one day either he was going to kill me, whether it be that day, or he was going to hurt me so bad that I -- whether paralyzed or brain dead."

Although the Defendant had calmed down based on the victim's comment that her father was coming, the victim did not believe the Defendant would de-escalate.  She went outside through the back door of the house with her children.  When she got to her car, she realized her children did not have shoes on and sent them back inside to get them.  Once they returned, the victim left the home with her children and called her parents and the police.  The victim called the police to get an escort to return to her home to retrieve her personal belongings.

The 911 recording of the victim's call was admitted into evidence as an exhibit, played for the jury, and reflects, in relevant part, as follows:

> Yes.  I was transferred to you guys from the sheriff's department.  I have a – I've been trying to move out of my home I've been in for six years.  It's my kids' father's house.  Today there was an issue and I'm needing to get my stuff.  He kind of put us out of the house.  We don't have any of our belongings.  And he just told me to see what I needed to do.  I will have to wait, like, an hour or so.  I've left, but my family that could come help is about an hour, hour and a half away.  But he said, you know, you guys could help assist me with getting my stuff so there's no, you know you know, I'm not being hit on or, you know, threatened or anything.

The dispatcher advised the victim that deputies were not on standby for such situations; however, a deputy would contact the victim later by phone.  The victim was

contacted by a deputy shortly thereafter, and she went to the police station. While at the police station, the victim began receiving text messages from the Defendant. Photographs of the text messages were admitted into evidence and showed that the Defendant acknowledged he was upset about what the victim had written in the child support paperwork, and he pleaded with the victim to save their relationship. The Defendant did not admit to physically touching the victim in the text messages.

The victim testified that she was genuinely afraid of the Defendant, which was why she needed an escort to return to retrieve her belongings. A deputy later contacted the victim and told her it was safe to return home because the Defendant was not there. The victim returned home with a friend, and although the door was locked, she gained entry by breaking a small window above the door and unlocking it. Before going inside the home, the victim tried to contact the Defendant's parents, who lived across the street, but they did not answer her phone calls. Once inside the home, the Defendant's parents walked over and were civil with the victim.

The victim agreed that the Defendant had caused her bodily injury in the past and that the incidents followed a pattern of violence. She described the pattern of violence consistently with her testimony from the motion in limine hearing. The Defendant would "get mad, screaming, yelling, trying to intimidate me, pushing on me, always threatening me, telling me to get the F out. You and the kids just f****** go. Just go. Just go. But when I would start to leave, that's when it would get physical. He would either pull me in by the hair of my head, just whatever he had to do, because he didn't want me to leave." The victim then described an incident of violence during which the Defendant broke the victim's tooth, cracked a veneer, and busted her jaw. Asked what was going through her mind on the day of the offense when the Defendant screamed, "I should blow your F'ing brains out," the victim said, "That he's either going to blow my brains out or he's going to hit me."

On cross-examination, the victim denied calling 911 solely to get help retrieving her things and explained she wanted a deputy present so the Defendant would not hit her. She denied that she made up the allegations of violence by the Defendant only after she was advised she would be unable to obtain an escort. She agreed that she did not recall everything she told the deputies when she initially spoke to them and provided her statement and that some things may have been left out. She explained she was hesitant about telling them the "full story" because she was afraid. She omitted from her prior statement that the Defendant was throwing things and that her son was injured during an assault. She also agreed that she testified in a previous hearing that the Defendant did not ask her to leave and pulled her hair, but she explained that she did so because she was nervous. She maintained, however, that physical abuse would often happen the way she had previously described.

The victim denied that the August 2020 photo, which she claimed was taken after the Defendant punched her, was a photo of a previously abscessed tooth. She clarified that her tooth fell out and became abscessed because the Defendant punched her. She agreed that she had never made any accusations of domestic violence against the Defendant before the instant offense. The victim was asked about a prior instance of violence during which the Defendant locked her in the laundry room, and the Defendant's parents were outside the home in the car with their children. She said the Defendant's parents stood outside during the confrontation and later came inside with the children, but there was "not anything to see" during that incident. She agreed the Defendant had never pulled a gun on her.

The victim claimed that as she was leaving on the day of the offense, the Defendant "punched his truck." A video taken the day of the offense from surveillance cameras on the home showed when the victim reached her car and was admitted into evidence. The victim agreed that the video did not show the Defendant punching his truck. She explained that the Defendant had not given defense counsel another video showing when they initially went outside, and the Defendant punched the truck. The victim agreed the Defendant was not violent in the video. The victim denied that she was trying to prevent the Defendant from seeing his children, and she explained that the Defendant was denied child custody based on a positive drug test.

On redirect examination, the victim explained that the August 2020 photograph was not taken on the day the Defendant hit her in the mouth and knocked out her tooth. She said the photo was taken a few days after he hit her and showed that her jaw was swollen and bruised. She was certain, however, that the Defendant hit her on the left side of her face.

Investigator Alex Bell with the Coffee County Sheriff's Department was on duty the day of the offense, spoke with the victim concerning an escort, and advised her to come to the sheriff's office. When the victim arrived, she provided a written statement before being interviewed. Investigator Bell acknowledged that the victim received text messages from the Defendant while she was at the office, but he denied instructing the victim on how to respond. Investigator Bell made the decision to charge the Defendant with domestic assault, which was based on information from the victim and Deputy Charles Burns. Investigator Bell learned that the victim's key was taken from her when she was pushed out of the house, and he advised the victim she remained a resident of the home because her property was inside.

On cross-examination, Investigator Bell agreed that the victim was not initially pressing charges against the Defendant and that she was trying to get help getting back

inside her home to retrieve her property. He denied that the victim told him about the assault only after he told her they did not provide escort service. He denied asking the victim if she was assaulted and he explained that he asked her generally what happened. He agreed that the victim told him that the Defendant said she was lucky he did not blow her brains out and that the Defendant pushed her twice. He agreed that the victim told him that during the second push, the Defendant took her key away. He agreed that the victim did not tell him that the Defendant threw anything at her, assaulted his son, or pulled her hair. He said Deputy Burns was at the Defendant's home for forty-five minutes before the decision to arrest the Defendant was made. He denied telling the victim to break into the house. On redirect examination, he agreed that he told the victim she was still a resident of the house and that the statement was made in the context of how the victim could get back inside her house to obtain her belongings without the key.

As part of the defense proof, James Cummings, the Defendant's father and a retired Army veteran, testified that he lived across the road from his son and had known the victim for six years. The victim would often come to his home, and they would sit and talk. Cummings had never observed the Defendant being physical with the victim. Asked if he had ever observed the victim with a swollen cheek, he replied, "She was over there one evening[,] and she was telling me that some kind of pill she took and it made it like that[,] and she said, if you didn't know any better, you'd think that [the Defendant] hit me." He identified the second page of the August 2020 photograph as being consistent with how the victim appeared on the night she said this. Cummings denied ever being at the Defendant's home when the Defendant locked the victim in the house. On cross-examination, Cummings was certain the August 2020 photographs were the result of a pill the victim had taken; however, he was uncertain as to any other specifics. He denied there was any incident at his home involving a firearm between the Defendant and his oldest son.

The Defendant, an owner of a trucking company, testified on his own behalf and denied each of the claims alleged by the victim. On August 1, 2020, he recorded a video of the victim's mouth because she had woken up that morning and her jaw was swollen. The Defendant said that her tooth was black, and they did not know what was wrong. The Defendant explained that they took the photo because they were looking it up on Google and WebMD trying to figure out what was wrong. The Defendant was shown a still photograph taken from the video, which was admitted into evidence. Although the victim claimed that it was the left side of her mouth that was injured or abscessed, the Defendant claimed, based on the video, that it was her right side. He denied "flipping" the image around to make it look like it was on the right side. The video from which the photograph was taken was admitted into evidence. The Defendant corroborated his father's testimony regarding the night the victim discussed her jaw with his parents. He said following the victim's comment that the Defendant may have done something to her, they all laughed.

Regarding the instant offense, the Defendant recalled that he woke up that morning and "had a feeling that something wasn't right." He sat on his back porch, looked in the victim's car, and saw her backpack with paper sticking out with his name and business name on it. He discovered the paperwork was for seeking child support from him, and he was shocked and hurt because the victim and his children had been living with him for six years. He said he had paid for the victim to go to nursing school, and she had not paid any bills for six years.

After the Defendant confronted the victim with the paperwork, he told the victim to leave. He denied shouting at the victim but agreed he may have raised his voice. He denied any physical contact with the victim and stated he was on the opposite side of their sectional couch. He said he never left the kitchen area of their house, and while the victim was on the other side of the house, he told her to look at the paperwork in the kitchen to see what she wrote. He said the victim walked back to the kitchen "hysterical," "frowned up," and trying to "exaggerate the situation." As she was reading over the papers in the kitchen, "she's backing up and . . . kind of fumbles over the -- the shoes a little bit. And her and my kids . . . walk on out the door."

The Defendant claimed, consistent with the video of them on the porch that he never got close to the victim. He denied touching her or going anywhere near her. He also denied punching his truck and making any statement about shooting, killing, or blowing the victim's brains out. He denied having any weapons in his hands and shoving the victim.

On cross-examination, the Defendant denied taking the video of the victim "while she was asleep[.]" He said the voices in the background of the video were from the television. Consistent with his testimony from a previous hearing, the Defendant said, "the only time the victim had ever had bruises" was when she would get injections "to make [her lips] plump[.]" The Defendant agreed that the photos from August 2020 shown to the jury were taken by the victim and were "selfies." He agreed that a photo taken with the right hand over the right shoulder would appear over the left shoulder. The Defendant agreed that he had smoked marijuana during the relevant period, but he denied engaging in any other drug use. He agreed he tested positive for cocaine in November, but he insisted he did not know how that happened. He denied owning any firearms at the time of the offense, but he admitted that revolvers were present in his pickup truck on his property. He agreed the cameras outside of his home were motion activated, but he denied any other video existed showing that he pushed the victim on the day of the offense. He agreed that when the deputies responded to his home on the day of the offense, they noticed the video cameras and asked if they were working. However, the Defendant did not recall his response.

On redirect examination, the Defendant agreed that the allegations against him were from inside his home and that he did not have cameras inside his home. He also said that he had not seen his children in nine months and that the victim had opposed him getting his children back.

In rebuttal, Deputy Charles Burns testified that he was called to the Defendant's home and, upon arrival, asked the Defendant if there were any video cameras in the house. Deputy Burns testified that the Defendant said the video cameras did not work. On cross-examination, Deputy Burns agreed that he did not ask the Defendant where the cameras were located.

Based on the above proof, the jury convicted the Defendant in count one of assault by causing another to reasonably fear imminent bodily injury; however, they were unable to reach a verdict in count two for assault by extremely offensive physical contact, which was subsequently dismissed. The Defendant was sentenced to eleven months and twenty-nine days probation after service of ten days in confinement. On July 23, 2023, the Defendant filed a motion for a new trial, which was denied. The Defendant filed a timely notice of appeal, and this case is properly before this court for review.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant contends the evidence in support of his conviction for domestic assault by causing another to reasonably fear imminent bodily injury was insufficient as a matter of law. As grounds, the Defendant cites Devine v. State, 786 S.W.2d 268, 270-71 (Tex. Crim. App. 1989) (holding that threats of future harm absent any overt conduct by the defendant to place the victim in fear fail to qualify as assault) and argues any fear that may have been generated by yelling, "You're lucky I'm not blowing your f****** brains out right now!" was neither reasonable nor imminent because he was not armed. The Defendant asserts that no reasonable person would interpret the statement as a threat since he expressly said that he was not going to hurt the victim and lacked the intent to cause her any harm. Secondly, the Defendant argues that any fear of injury was not imminent because he was neither armed nor close to any weapons.

In response, the State contends the evidence is sufficient to support the conviction. While the domestic assault statute does not require a verbal threat, the State insists the Defendant's language, combined with his physical acts of grabbing the victim by the neck, dragging her to another room, and forcing her head to the counter while berating her are sufficient to establish a finding that the Defendant intentionally caused the victim to fear imminent bodily injury.

In his reply brief, the Defendant points out that at trial, the State elected to proceed with the Defendant's verbal threat against the victim in support of count one. Specifically, the State said in closing argument that the Defendant knowingly caused fear by saying, "I will blow your brains out!"[1] The Defendant insists the physical acts relied upon by the State in this appeal to support the conviction in count one are the same acts relied upon by the State in its election in support of count two, which was ultimately dismissed after the jury hung at trial. The Defendant posits that the State is limited to the election it made at trial to support count one. In response to this court's inquiry about the State's election at trial, the State responded at oral argument that the Defendant's challenge on appeal is limited to the sufficiency of the evidence and that the State was not otherwise required to make an election in this case.

**Law.** "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331

---

[1] Throughout the Defendant's brief he correctly observes that the State misstated the victim's testimony; however, the Defendant did not object to this mischaracterization at trial.

- 11 -

S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

To sustain a conviction for domestic assault by causing another to reasonably fear imminent bodily injury as charged in this case, the State was required to prove that the Defendant committed "an assault as defined in § 39-13-101 against a domestic abuse victim." Tenn. Code Ann. § 39-13-111. Tennessee Code Annotated section 39-13-101 defines assault as follows:

(a) A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Id. § 39-13-101(a). When bodily injury results or is reasonably feared, the offense is a Class A misdemeanor. Id. § 39-13-101(b)(1). If only physical contact which is extremely offensive or provocative occurs, the offense is a Class B misdemeanor. Id. "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(a)(21). A person acts "knowingly" if that person acts with an awareness: (1) that his or her conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result. See id. § 39-11-106(a)(23). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Id. § 39-11-106(3).

The Tennessee Supreme Court has previously quoted with approval the following definition of "imminent":

Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand,

- 12 -

something to happen upon the instant, close although not yet touching, and on the point of happening.

State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999) (quoting Black's Law Dictionary 750 (6th ed. 1990)) (threat of death or serious bodily injury is "imminent" for reckless endangerment if the victim is placed in a reasonable probability of danger as opposed to a mere possibility of danger). In discussing the element of fear in the assault statute, this court has held that "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury" and that "the apprehension of imminent bodily harm may be inferred from the conduct of the victim following the [alleged] assault." State v. Jackson, No. M2019-01128-CCA-R3-CD, 2020 WL 2488763, at *13 (Tenn. Crim. App. May 14, 2020) (internal citations omitted).

As an initial matter, the State charged the Defendant with alternative counts of assault stemming from the same criminal episode. Following the proof, the Defendant moved the trial court to require the State to elect the conduct it relied on for each count, which was granted over the State's objection that an election was not required. Obviously, the Defendant does not contest the propriety of the election under these circumstances, and the question of jury unanimity is not before us. Instead, the Defendant challenges the impact of the State's election in count two on the sufficiency of the evidence in count one. In evaluating this issue, we note that "[t]he right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based on a single criminal occurrence." See State v. Lemacks, 996 S.W.2d 166, 171 (Tenn. 1999). Moreover, our review of the record shows the trial court was concerned with count two of the indictment because the State had proven multiple offensive "touchings" including pushing the victim, jerking her neck or hair, and slamming her face on the countertop. The trial court required the State to elect which physical act supported count two, and the State elected to rely on the Defendant's slamming the victim's head on the kitchen counter. The court did not require the State to elect conduct in support of count one and stated, "I do not think the State has to pick the exact word that was a threatening word. I think they can look at the context of the circumstances. So[,] I'm going to – I'm not going to make them elect as to [c]ount 1(a)." Accordingly, the State's election in count two, which was dismissed, does not preclude our consideration of the other facts and circumstances surrounding the Defendant's verbal statement, "You're lucky I'm not blowing your f****** brains out right now[!]"

Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that the Defendant intentionally or knowing caused the victim to fear imminent bodily injury. First, the Defendant asserts that no reasonable person would interpret the statement concerning the victim being lucky the Defendant did

not blow her "f\*\*\*\*\*\*" brains out as a threat since he expressly said that he was not going to hurt the victim and lacked the intent to cause her any harm. We agree with the Defendant that the statement in isolation may not constitute a threat. However, our focus for purposes of a conviction of assault by causing another to fear bodily injury is not limited to the precise language a defendant employs but rather the manner in which he wields his words against the victim.

In our view, the Defendant's statement implied that the victim's safety was conditioned upon luck, the absence of which would have caused the victim to suffer bodily injury in the form of having her head blown off or by being struck by the Defendant. Based on her six-year relationship with the Defendant, the victim had been subjected to a pattern of violence in which he would get angry with the victim, yell at her to leave, and when she would attempt to leave, he would physically and violently stop her. On the morning of the instant offense, the Defendant engaged in the same pattern when he found paperwork indicating the victim was seeking child support from him. This angered the Defendant, and he yelled at the victim, "[Y]ou're lucky I'm not blowing your f\*\*\*\*\* brains out. How could you do this to me?" The victim knew there were firearms in the home, and she believed the Defendant was going to either "blow [her] brains out or . . . hit [her]." The Defendant began throwing things, such as cleaning bottles, at the victim, and as she tried to move away from him, he grabbed her neck and jerked her from the bathroom to the kitchen. He then slammed her head on the kitchen counter tabletop. The Defendant was so close to the victim that she felt his spit on her face. The victim said she was afraid of the Defendant during the entire twenty-minute encounter. Based on the Defendant's conditional statement of harm, his history of violence against the victim, and the Defendant's actions during the instant encounter, it was reasonable for the victim to fear imminent bodily injury.

The Defendant next argues that the victim's fear was neither reasonable nor imminent because he was neither armed nor close to any weapons. However, actual danger is not an element of assault committed by placing the victim in reasonable fear of imminent harm. A person can commit the offense of assault by placing another person in fear of danger, even if there is no risk of danger. State v. Moore, 77 S.W.3d 132, 135-36 (Tenn. 2002) (unlike reckless endangerment cases, assault cases do not require the victim to show that he or she was in a "risk of danger"); State v. Thomas, No. E2013-02196-CCA-R3-CD, 2014 WL 2021952, at \*4 (Tenn. Crim. App. May 15, 2014). This is because the crux of assault focuses not on whether the victim was in a zone of danger but on "whether [the victim's] fear of imminent bodily injury was reasonable." State v. Goldberg, No. M2017-02215-CCA-R3-CD, 2019 WL 1304109, at \*12-13 (Tenn. Crim. App. Mar. 20, 2019) (quoting State v. Johnson, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at \*6 (Tenn. Crim. App. Sept. 15, 2010) and citing State v. Young, No. M2010-01531-CCA-R3-

- 14 -

CD, 2011 WL 6291813, at *8 (Tenn. Crim. App. Dec. 14, 2011)). "Imminent danger is an immediate, real threat to one's safety." Black's Law Dictionary (8th ed. 2004).

Once the victim left the home, she immediately called her family and 911 for help in returning home to retrieve her belongings. State v. Tucker, No. M2014-00861-CCA-R3-CD, 2015 WL 832516, at *5 (Tenn. Crim. App. Feb. 26, 2015) (reasonable and legitimate inferences to be drawn from the evidence following the offense support the conclusion that the victim reasonably feared imminent bodily injury); State v. Whited, No. M2005-00167-CCA-R3-CD, 2006 WL 548228, at *11 (Tenn. Crim. App. Mar. 7, 2006) (noting that a victim's fear may be inferred from the circumstances surrounding the offense and collecting cases); State v. Schrantz, No. W2002-01507-CCA-R3-CD, 2003 WL 22888910 (Tenn. Crim. App. Dec. 2, 2003). The 911 call established that the victim was calling to obtain an escort to avoid "being hit on or, you know, threatened or anything." The jury was entitled to make the reasonable inference that her actions in calling her family and 911 for assistance in retrieving her personal belongings sprang from a fear of imminent bodily injury. Accordingly, we conclude the evidence is sufficient to sustain the conviction for domestic assault, and the Defendant is not entitled to relief.

**II.  Admission of Rule 404(b) Evidence.**  Next, the Defendant argues the trial court abused its discretion by admitting prior bad acts, namely, an allegation that the Defendant had punched the victim two years earlier and broken her tooth. In response, the State argues the trial court properly admitted the evidence. We agree with the State.

**Law.**  Evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Rule 404(b).

Rule 404(b) states:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1)  The court upon request must hold a hearing outside the jury's presence;

(2)  The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state

on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

Trial courts have been encouraged to take a "'restrictive approach' to Rule 404(b) evidence because such proof 'carries a significant potential for unfairly influencing a jury.'" State v. Jackson, 444 S.W.3d 554, 601 (Tenn. 2014) (quoting State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008)). "[T]he risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment-creates a prejudicial effect that outweighs ordinary relevance." Id. (quoting State v. Sexton, 368 S.W.3d 371, 403 (Tenn. 2012)). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)).

Despite this general rule of exclusion, Tennessee courts have recognized a "line of cases" that stand for the proposition "that violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Jarman, 604 S.W.3d 24, 49-51 (Tenn. 2020) (citing State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981) (citations omitted) (holding that evidence of the defendant's prior break-in at the victim's home and a prior threatening postcard were both relevant because the acts show the "relations existing between the victim and the defendant prior to the commission of the crime" and the acts "indicate[d] hostility toward the victim and a settled purpose to harm or injure her"); State v. Turnbill, 640 S.W.2d 40, 47 (Tenn.

Crim. App. 1982) ("[T]he prior relations between the victim and the appellant were relevant matters for the jury's consideration on the question of the appellant's intent.").

When "a trial court substantially complies with the procedures set out in Rule 404(b) for evaluating the admissibility of evidence, the court's decisions will be given great deference on appeal and will be reversed only if the trial court abused its discretion." Jarman, 604 S.W.3d at 49 (citing State v. Dotson, 450 S.W.3d 1, 76-77 (Tenn. 2014) and State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). The record shows the trial court substantially complied with the procedures in Rule 404(b); accordingly, we review for an abuse of discretion. This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

The Defendant argues the trial court erred in admitting the August 2020 incident because it did not show a "settled purpose to harm," it was too remote from the instant offense, and it was improper to show that the victim's fear was reasonable. The State argues, and we agree, that the evidence of the August 2020 assault falls squarely within the "Smith line of cases" that permit prior acts of violence between the Defendant and the victim to be admitted to show motive or intent and that the Defendant's intent was a material issue in this case. The record shows the Defendant and the victim had been in a six-year relationship, lived in the same household, and shared two small children. In August of 2020, he punched her in her jaw. The trial court acknowledged that the 2020 alleged assault happened approximately two years before the instant offense but still found the evidence to be probative of "the relationship between the parties, the intent, a settled purpose to harm the victim." The court stated the allegations were not "super old" and were within two years of the instant offense. Finally, the court determined the August 2020 assault was relevant because the statute requires one "to look somewhat as to the mind of the victim" and whether her fear was reasonable under all the facts and circumstances.

We conclude that the trial court properly admitted the evidence of the August 2020 assault on the issue of intent and to establish that the victim's fear was reasonable. We further conclude that the court did not err in finding that the probative value of this evidence was not outweighed by the danger of unfair prejudice. Although we certainly recognize that this evidence is prejudicial to the Defendant, we cannot conclude that the trial court abused its discretion in finding that the probative value was not outweighed by the danger of unfair prejudice. Accordingly, the Defendant is not entitled to relief.

- 17 -

## CONCLUSION

Based upon the above reasoning and authority, we affirm the judgment of the trial court.


_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE